

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-23-2006

# Stolt Nielsen v. USA

Precedential or Non-Precedential: Precedential

Docket No. 05-1480

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Stolt Nielsen v. USA" (2006). *2006 Decisions.* Paper 1338.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1338

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  05-1480

_____

STOLT-NIELSEN, S.A.;
STOLT-NIELSEN TRANSPORTATION GROUP LTD.;
RICHARD B. WINGFIELD

v.

UNITED STATES OF AMERICA

Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 04-cv-00537)
District Judge: Honorable Timothy J. Savage

_____

Argued September 30, 2005

Before: ALITO[*] and AMBRO, <u>Circuit Judges</u>
RESTANI,[**] <u>Judge</u>

(Opinion filed: March 23, 2006)

R. Hewitt Pate
   Assistant Attorney General
Scott D. Hammond
Makan Delrahim
   Deputy Assistant Attorneys General
John P. Fonte, Esquire
John J. Powers, III, Esquire (Argued)
United States Department of Justice
Antitrust Division, Room 30224
950 Pennsylvania Avenue, N.W.
Washington, D.C.   20530

Robert E. Connolly, Esquire
Antonia R. Hill, Esquire
Wendy B. Norman, Esquire
Kimberly Justice, Esquire
Richard S. Rosenberg, Esquire

---

[*] Then Judge, now Justice, Alito heard oral argument in this case but was elevated to the United States Supreme Court on January 31, 2006.  This opinion is filed by a quorum of the panel.  28 U.S.C. § 46(d).

[**] Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

U.S. Department of Justice
One Independence Square West
7th & Walnut Streets, Suite 650
Philadelphia, PA   19106-2424

Counsel for Appellant

Ian M. Comisky, Esquire
Matthew D. Lee, Esquire
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA   19103

George J. Terwillinger III, Esquire
John M. Gidley, Esquire
Christopher M. Curran, Esquire (Argued)
Lucius B. Lau, Esquire
White & Case LLP
701  Thirteenth Street, N.W.
Washington, D.C.  20005

Counsel for Appellee Stolt-Nielsen S.A. and
Stolt-Nielsen Transportation Group Ltd.

Roberta D. Liebenberg, Esquire
Allen D. Black, Esquire (Argued)
Gerard A. Dever, Esquire
Fine, Kaplan & Black
1835 Market Street, 28th Floor
Suite 2300

Philadelphia, PA   19103

James A. Backstrom, Jr., Esquire
Suite 200
Two Penn Center Plaza
Philadelphia, PA  19102

> Counsel for Appellee
> Richard B. Wingfield

---

## OPINION  OF  THE COURT

---

AMBRO, <u>Circuit Judge</u>

This case raises a significant constitutional question of first impression in this Circuit: whether federal courts have authority, consistent with the separation of powers, to enjoin the executive branch from filing an indictment.  Although federal courts have this authority in narrow circumstances, we conclude that this is not such a case and therefore reverse the District Court's judgment to the contrary.

4

## I.

### A.     Background

Appellee Stolt-Nielsen, S.A., through its subsidiary Stolt-Nielsen Transportation Group Ltd. (collectively "Stolt-Nielsen" or the "Company"), is a leading supplier of parcel tanker shipping services.  In March 2002, Stolt-Nielsen's general counsel, Paul O'Brien, resigned.  According to a complaint O'Brien filed against Stolt-Nielsen in Connecticut Superior Court in November 2002, and a subsequent article in The Wall Street Journal, O'Brien advised his superiors of illegal collusive trading practices between Stolt-Nielsen and two of its competitors, and resigned after the Company failed to take action to resolve the problem.  On receiving O'Brien's November 2002 complaint, Stolt-Nielsen hired John Nannes, a former Deputy Assistant Attorney General in the Antitrust Division at the U.S. Department of Justice, to conduct an internal investigation of possible antitrust violations by the Company and advise it regarding any criminal liability.

On November 22, 2002, Nannes met with the chairman of Stolt-Nielsen's tanker division, Samuel Cooperman.  Cooperman informed Nannes that O'Brien "rais[ed] some antitrust concerns" in early 2002, and that in response Stolt-Nielsen revised its antitrust compliance policy and disseminated it to its employees and competitors.  Cooperman also told Nannes that he believed an internal investigation would

5

demonstrate that the Company was in violation of federal antitrust laws and asked Nannes about the possibility of leniency from the Department of Justice. With Cooperman's permission, Nannes spoke with an Antitrust Division official later that day to inquire about amnesty if Stolt-Nielsen were to admit its violations, and the Government informed him that an investigation had already begun.

Specifically, Nannes inquired about possible protection for Stolt-Nielsen and its officers under the Antitrust Division's Corporate Leniency Policy. Under this Policy, the Government agrees "not [to] charg[e] a firm criminally for the activity being reported" if (in the case of an applicant who comes forward after an investigation has begun) seven conditions are met: (1) the applicant is the first to report the illegal activity; (2) the Government does not, at the time the applicant comes forward, have enough information to sustain a conviction; (3) the applicant, "upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity"; (4) the applicant's report is made "with candor and completeness and provides full, continuing and complete cooperation" with the Government's investigation; (5) the applicant confesses to illegal anticompetitive conduct as a corporation and not merely through individual confessions by corporate officers; (6) the applicant makes restitution where possible; and (7) the Government determines that granting leniency to the applicant would "not be unfair to others." The officers and directors of the corporation who assist with the

6

investigation are considered for immunity from prosecution on the same basis as if they had come forward individually.

### B. The Conditional Leniency Agreement

The Government informed Nannes that Stolt-Nielsen would not be eligible for amnesty under the Corporate Leniency Policy if O'Brien's departure was involuntary and due to his exposure of the Company's antitrust violations. Nannes assured the Government that O'Brien left voluntarily and detailed the changes to the Company's antitrust policy that were implemented in response to O'Brien's concerns. During the ensuing investigation, Nannes learned that between 1998 and 2001 a Stolt-Nielsen executive, Andrew Pickering, exchanged customer allocation lists with two of Stolt-Nielsen's competitors, presumably for the purpose of apportioning customers among the companies and restraining competition. In January 2003, Pickering's successor, appellee Richard Wingfield, provided Nannes with four such lists, which confirmed that Stolt-Nielsen had indeed engaged in illegal anticompetitive behavior. Nannes promptly turned these lists over to the Government, which entered into a Conditional Leniency Agreement (the "Agreement") with Stolt-Nielsen on January 15, 2003.

Under the terms of the Agreement, the Government agreed "not to bring any criminal prosecution against [Stolt-Nielsen] for any act or offense it may have committed prior to

the date of this [Agreement] in connection with the anticompetitive activity being reported." This promise was, of course, subject to Stolt-Nielsen's strict compliance with the aforementioned conditions, "[s]ubject to verification [by the Government] and subject to [Stolt-Nielsen's] full, continuing and complete cooperation." The Agreement further stated:

> If the Antitrust Division at any time determines that [Stolt-Nielsen] has violated this Agreement, [it] shall be void . . . . Should the Antitrust Division revoke the conditional acceptance of [Stolt-Nielsen] into the Corporate Leniency Program, the Antitrust Division may thereafter initiate a criminal prosecution against [Stolt-Nielsen], without limitation. Should such a prosecution be initiated, any documentary or other information provided by [Stolt-Nielsen], as well as any statements or other information provided by any current or former director, officer, or employee of [Stolt-Nielsen] to the Antitrust Division pursuant to this Agreement, may be used against Stolt-Nielsen in any such

prosecution.

The Agreement also provided that the Government would not prosecute officers and directors of the Company who "admit their knowledge of, or participation in, and fully and truthfully cooperate with the Antitrust Division in its investigation of the anticompetitive activity being reported." Specifically, that cooperation entailed: (1) producing all documents and records requested by the Government; (2) being available for Government interviews; (3) "responding fully and truthfully to all inquiries of the [Government] . . . without falsely implicating any person or intentionally withholding any information"; (4) voluntarily providing any information or materials not requested by the Government that were nonetheless relevant to the investigation; and (5) testifying under oath when asked by the Government. It concluded with a standard integration clause: "This letter constitutes the entire agreement between the [parties], and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein."

Using the information provided by Stolt-Nielsen and its executives (including Wingfield), the Government secured guilty pleas from Stolt-Nielsen's co-conspirators, resulting in prison sentences for individual executives at those companies and fines totaling $62 million.

## C.     The Government Terminates the Agreement

In the weeks following execution of the Agreement, the Government's investigation revealed that Stolt-Nielsen's participation in the conspiracy persisted for several months after O'Brien raised his concerns to Cooperman in early 2002.  The Government concluded that Stolt-Nielsen, and Wingfield in particular, continued to collude unlawfully  with competitors until November 2002.   Based on this information, the Government informed Nannes on April 8, 2003 that it was suspending Stolt-Nielsen's obligations under the Agreement and considering withdrawing the grant of conditional leniency entirely because the Company did not take "prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity," as required by the Agreement.  One of Wingfield's subordinates, Bjorn Jansen, then admitted that the anticompetitive agreement between Stolt-Nielsen and its competitors was still in place in the fall of 2002, despite having told Nannes that such conduct ceased in March 2002 once the Company learned of O'Brien's allegations and issued its new antitrust policy.

In June 2003, the Government concluded that Wingfield had not fulfilled his obligations under the Agreement because he never informed the Government that his unlawful communications with Stolt-Nielsen's competitors did not cease in March 2002 when Stolt-Nielsen issued its new antitrust policy.  On June 24, 2003, the Government charged Wingfield

10

by criminal complaint with violating the Sherman Act, 15 U.S.C. § 1. The Government withdrew its grant of conditional leniency to Stolt-Nielsen on March 2, 2004, and announced that it intended to indict the Company and Wingfield for violations of the Sherman Act.[1]

### D.     District Court Proceedings

Shortly before the Government revoked Stolt-Nielsen's conditional leniency, the Company and Wingfield filed complaints in the United States District Court for the Eastern District of Pennsylvania seeking enforcement of the Agreement and an injunction preventing the Government from filing indictments against them. The Government agreed to postpone its indictments of both parties pending the District Court's consideration of the complaints.

The District Court bifurcated the proceedings into two phases. In Phase One, the Court considered whether Stolt-

---

[1] Although the Government "charged" Wingfield by criminal complaint in June 2003, it could not prosecute him without an indictment. See 1 Charles Alan Wright, Fed. Practice & Procedure § 121, at 518 (3d ed. 1999) ("Although a criminal proceeding may be instituted by a complaint, this only permits issuance of a warrant for the arrest of the offender, and he cannot be tried unless an indictment or information, as the case may require, is brought against him.").

Nielsen's alleged conduct between March and November 2002 violated the terms of the Agreement. If so, Phase Two would determine whether the conduct actually occurred. During the Phase One proceedings, the District Court consolidated consideration of Stolt-Nielsen's and Wingfield's requests for preliminary injunctions with the trial on the merits, and heard testimony from Nannes and James Griffin, the Assistant Attorney General in charge of the Antitrust Division at the Department of Justice.

In January 2005, the District Court granted judgment in favor of Stolt-Nielsen and Wingfield and permanently enjoined the Government from indicting either of them for violations of the Sherman Act. See Stolt-Nielsen S.A. v. United States, 352 F. Supp. 2d 553 (E.D. Pa. 2005). The Court concluded that the Government could not unilaterally rescind the Agreement without a judicial determination that Stolt-Nielsen and Wingfield breached it, an issue appropriate for consideration before indictment "because if an indictment were later determined to have been wrongfully secured, it would be too late to prevent the irreparable consequences." Id. at 560. The Court further found that the Agreement did not specify a discovery date and instead granted amnesty for activity before January 15, 2003, the date on which it was signed. Indeed, it found that "the date when [Stolt-Nielsen] ended its participation [in the conspiracy] was never clearly established," id. at 562 n.10, and therefore, in light of the Agreement's integration clause, "DOJ, especially because it drafted the agreement,

12

cannot depend upon a tacit understanding of what it contends was meant [to be the discovery date] but was not memorialized in the integrated agreement." Id. at 562. The Court concluded:

> The agreement immunizes [Stolt-Nielsen] from prosecution for activity prior to January 15, 2003. Now DOJ contends the activity had to have stopped at an earlier unspecified date that is not set forth in the agreement. Had it wanted to fix the date sometime before January 15, 2003, it could have replaced the words "to the date of this letter" with the earlier date it now contends the parties contemplated.
>
> . . . [The Government's] goals [in concluding the Agreement with Stolt-Nielsen] were to pursue [Stolt-Nielsen's] co-conspirators and break up the conspiracy. It got what it had bargained for in the agreement. . . . Now that it has received the benefit of the bargain, DOJ cannot prosecute the party that incriminated itself when it

13

> delivered the evidence DOJ used to
> accomplish its goals.

Id.

### E. **Appeal**

On appeal, the Government contends that the District Court erred in two respects. First, it argues that federal courts lack jurisdiction to enjoin the executive branch from filing an indictment. Second, it asserts that the District Court erred in holding that Stolt-Nielsen's and Wingfield's actions between March and November 2002 did not violate the terms of the Agreement. For the reasons that follow, the District Court's judgment is reversed and the case remanded to that Court so that it may dismiss the appellees' complaints.[2]

## II.

We review a District Court's grant or denial of a permanent injunction for abuse of discretion, United States v. Bell, 414 F.3d 474, 478 (3d Cir. 2005), but exercise plenary

---

[2] The District Court had jurisdiction over this case under 28 U.S.C. § 1331, as it is a civil action arising under the laws of the United States. Our jurisdiction arises under 28 U.S.C. § 1291, since the Government filed a timely notice of appeal from a final decision of the District Court.

review over the District Court's underlying legal conclusions. Freethought Soc'y of Greater Phila. v. Chester County, 334 F.3d 247, 255–56 (3d Cir. 2003). A District Court's determination whether a cooperation agreement has been breached is a legal conclusion. United States v. Baird, 218 F.3d 221, 229 (3d Cir. 2000). All findings of fact are reviewed for clear error. See Bell, 414 F.3d at 478 (reviewing findings of fact related to a permanent injunction for clear error); Baird, 218 F.3d at 229 (reviewing findings of fact related to a cooperation agreement for clear error).

## III.

The Supreme Court has observed that the executive branch "has exclusive authority and absolute discretion to decide whether to prosecute a case," United States v. Nixon, 418 U.S. 683, 693 (1974), and the Government therefore argues that courts lack jurisdiction to enjoin a criminal prosecution. See United States v. Cox, 342 F.2d 167, 171 (5th Cir. 1965) (en banc) ("It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.").

There are exceptions to this general rule, however, usually to avoid a chilling effect on First Amendment rights. As the Supreme Court has recognized,

15

> [a] criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. . . . The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases. . . . [W]e have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.

Dombrowski v. Pfister, 380 U.S. 479, 486–87 (1965); see also Ashcroft v. ACLU, 542 U.S. 656, 670–71 (2004) (upholding preliminary injunction against criminal enforcement of the Child Online Protection Act because, inter alia, "[w]here a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial").

16

It is also well established that the Government must adhere strictly to the terms of agreements made with defendants — including plea, cooperation, and immunity agreements — to the extent the agreements require defendants to sacrifice constitutional rights. See, e.g., Santobello v. New York, 404 U.S. 257, 262 (1971); United States v. Hodge, 412 F.3d 479, 485 (3d Cir. 2005) ("The government must adhere strictly to the terms of the bargains it strikes with defendants. Because defendants entering pleas forfeit a number of constitutional rights, courts are compelled to scrutinize closely the promise made by the government in order to determine whether it has been performed." (citation and internal quotation marks omitted)).

Therefore, although the Government is certainly correct that there is no free-ranging jurisdiction on the part of courts to enjoin criminal prosecutions, that authority does exist in limited situations, typically those where the mere threat of prosecution would inhibit the exercise of First Amendment freedoms. Federal courts also have jurisdiction to consider, and hold the Government to, the terms of agreements it makes with defendants. The question thus becomes whether, in those cases not concerning First Amendment rights, the authority to enforce cooperation or immunity agreements may be exercised pre-indictment in the form of an injunction.

The District Court relied on a Seventh Circuit case, United States v. Meyer, 157 F.3d 1067 (7th Cir. 1998), as

17

authority for conducting a pre-indictment review of the Agreement before us. See Stolt-Nielsen, 352 F. Supp. 2d at 560–61. In Meyer, the Seventh Circuit stated, in dicta, that "the preferred procedure, absent exigent circumstances, would be for the government to seek relief from its obligations under the immunity agreement prior to indictment. Since the government is required to obtain a judicial determination of a defendant's breach prior to trial, it is but a de minimis inconvenience for the government to secure that determination pre-indictment." 157 F.3d at 1077.

We have no quarrel with the Seventh Circuit's observation that, in many circumstances, a pre-indictment determination of the parties' obligations under an immunity agreement would be a good idea. As we explain below, however, federal courts (including the Seventh Circuit) agree that a pre-indictment determination is not required. Indeed, notwithstanding its dicta regarding the "preferred procedure," the Meyer Court held the defendant was constitutionally "entitled to a judicial determination of his breach before being deprived of his interest in the enforcement of an immunity agreement," and that this "interest" was in not being convicted, rather than not being indicted. Id. at 1076–77.[3] As the Court

---

[3] In keeping with the case law discussed below, the Seventh Circuit reached this conclusion despite the fact that the immunity agreement before it stated that the Government would not "charge" the defendant. Meyer, 157 F.3d at 1077.

18

noted, "a post-indictment evidentiary hearing on the defendant's alleged breach was sufficient to satisfy due process." Id. at 1076 (citing United States v. Verrusio, 803 F.2d 885, 889 (7th Cir. 1986)).

Other immunity agreements that have promised not to charge or otherwise criminally prosecute a defendant, like the agreement at issue in this case, have likewise been construed to protect the defendant against conviction rather than indictment and trial. See, e.g., Heike v. United States, 217 U.S. 423, 431 (1910) (construing the Sherman Act's immunity provision, which protected a testifying witness from being "prosecuted," see Act of Feb. 25, 1903, ch. 755, § 1, 32 Stat. 854, 904 (repealed 1970), "not . . . to secure to a person making such a plea immunity from prosecution, but to provide him with a shield against successful prosecution, available to him as a defense"); United States v. Bailey, 34 F.3d 683, 690–91 (8th Cir. 1994) (holding that an agreement "not to prosecute" protected the defendant from "the inherent risk of conviction and punishment as a result of the trial, not the trial itself"); United States v. Bird, 709 F.2d 388, 392 (5th Cir. 1983) ("While the agreement is phrased in terms of nonprosecution, its essence is a promise of immunity. [The defendant's] immunity from punishment will not be lost simply because she is forced to stand trial.").

19

This distinction is grounded in the understanding that simply being indicted and forced to stand trial is not generally an injury for constitutional purposes but is rather "one of the painful obligations of citizenship." Cobbledick v. United States, 309 U.S. 323, 325 (1940); see Deaver v. Seymour, 822 F.2d 66, 69 (D.C. Cir. 1987) ("Although it is surely true that an innocent person may suffer great harm to his reputation and property by being erroneously accused of a crime, all citizens must submit to a criminal prosecution brought in good faith so that larger societal interests may be preserved.").[4] As the District of

---

[4] We do not address in this opinion those circumstances in which equity might serve to enjoin an ultra vires prosecution brought in bad faith. The Supreme Court has only approved federal injunctions against state criminal proceedings on that basis. See Younger v. Harris, 401 U.S. 37, 55 (1971) (noting that, although "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against [a state's] good-faith attempts to enforce it," a "showing of bad faith [or] harassment" might "justify federal intervention"); see also Howard W. Brill, Equity and the Criminal Law, 2000 Ark. L. Notes 1, 3-4 (noting that state courts have sometimes used injunctions to prevent bad-faith prosecutions, such as those brought solely to "harass and to retaliate for the exercise of constitutional rights," or where the prosecutor charges conduct that is not illegal). As our precedent makes clear, however, in the absence of a state prosecution, federal-state abstention doctrine is irrelevant and Younger does not apply. Pik-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1300 (3d Cir. 1996). Moreover,

20

Columbia Circuit noted in <u>Deaver,</u> in the absence of an unconstitutional chilling effect on First Amendment rights, the adversary system "afford[s] defendants, after indictment, a federal forum in which to assert their defenses — including those based on the Constitution. Because these defendants are already guaranteed access to a federal court, it is not surprising that subjects of federal investigation have never gained injunctive relief against federal prosecutors." 822 F.2d at 69–70.[5]

even if the principles of <u>Younger</u> or the willingness of certain state courts to entertain injunctions against bad-faith or illegal prosecutions could be applied to a federal prosecution, we perceive no bad faith on the part of the Government in this case; rather, the parties are engaged merely in a good-faith dispute over the meaning of the Agreement.

[5] We note that the District Court's finding that Stolt-Nielsen and Wingfield would be irreparably harmed by an indictment does not bring this case within the ambit of the cases in which injunctions against indictment and trial have been approved. Even assuming that irreparable harm is a factor that may properly be considered in deciding upon a permanent (as opposed to preliminary) injunction — which is a matter of some tension in our case law, <u>compare</u> <u>Chao v. Rothermel</u>, 327 F.3d 223, 228 (3d Cir. 2003) (stating that a permanent injunction may be granted "where the moving party has demonstrated that: (1) the exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded on the merits of its claim; and (3) the

Although this interpretation of agreements "not to prosecute" may seem counterintuitive, it comports with the federal courts' general reluctance to recognize a right not to be indicted or tried in the absence of an express constitutional (or perhaps statutory) command. In the context of interlocutory appeals challenging the Government's authority to proceed with a prosecution, for example, the Supreme Court has allowed those appeals only in very limited circumstances. For example, the Double Jeopardy Clause, see U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ."), protects interests that are "wholly unrelated to the propriety of any subsequent

_____

'balance of equities' favors granting injunctive relief"), and ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 nn.2–3 (3d Cir. 1996) (en banc) (noting that a preliminary injunction requires consideration of, inter alia, irreparable injury, while a permanent injunction merely requires consideration of whether "the plaintiff has actually succeeded on the merits," and, if so, whether an injunction is an "appropriate remedy" (internal quotation marks omitted)), with Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001) (stating that a court may grant a permanent injunction if it finds, inter alia, that "the moving party will be irreparably injured by the denial of injunctive relief" (citing Black Horse Pike, 84 F.3d at 1477 nn.2–3)) — we note that, as stated above, other courts have not accepted the argument that the unpleasantness of an indictment brought in good faith constitutes an injury that may be remedied by a pre-indictment injunction, and neither have we.

22

conviction," in that it provides a "guarantee against being twice put to trial for the same offense." Abney v. United States, 431 U.S. 651, 661 (1977) (emphasis added). Because the prohibition against double jeopardy affords a defendant the right to "contest[] the very authority of the Government to hale him into court to face trial on the charge against him," it necessitates an exception to the "firm congressional policy against interlocutory or 'piecemeal' appeals." Id. at 656, 659. Likewise, the Speech and Debate Clause, see U.S. Const. art. I, § 6, cl. 1 ("[F]or any speech or debate in either House, [members of Congress] shall not be questioned in any other Place."), has been construed "to protect Congressmen not only from the consequences of litigation's results but also from the burden of defending themselves," thus allowing interlocutory appeals from denials of claims of immunity under that Clause. Helstoski v. Meanor, 442 U.S. 500, 508 (1979) (internal quotation marks omitted).

Our case is not an interlocutory appeal, but the Supreme Court's cases in that field are instructive because they reinforce the narrowness of a defendant's ability to challenge the Government's decision to pursue a prosecution. Just as the authority to enjoin criminal enforcement of a law regulating speech is grounded in the overriding need to avoid a chilling effect on the exercise of core constitutional rights, so too does the right not to be prosecuted recognized in Abney and Helstoski stem from express textual commands in the Constitution that prohibit any interference with the rights against double jeopardy or of members of Congress to speak freely in legislative session.

23

In other contexts, however, courts have refused to allow interlocutory appeals to stop prosecutions. See, e.g., United States v. Hollywood Motor Car Co., 458 U.S. 263, 268 (1982) (per curiam) (holding that a vindictive prosecution claim may not be raised in an interlocutory appeal to stop an ongoing prosecution, but rather may only be raised after the defendant has been convicted, because "reversal of the conviction and . . . the provision of a new trial free of prejudicial error normally are adequate means of vindicating the constitutional rights of the accused"); Parr v. United States, 351 U.S. 513, 519 (1956) (holding that the mere fact a defendant would have to "hazard a trial" in one venue before challenging the District Court's order transferring his case from a different venue did not warrant an interlocutory appeal); cf. United States v. P.H.E., Inc., 965 F.2d 848, 855 (10th Cir. 1992) (noting that, in comparing the vindictive prosecution claim in Hollywood Motor Car to a vindictive prosecution claim based on the defendants' dissemination of constitutionally protected speech, "[t]he wrong alleged is similar, but the right sought to be vindicated is not" because the "procedural rule [at issue in Hollywood Motor Car] raises concerns distinct from and less pressing than the courts' obligation to protect the First Amendment right not to be subjected to a pretextual prosecution"). Indeed, when a district court rejects prior to trial a defendant's contention that an immunity agreement bars his conviction, the defendant may not avail himself of an interlocutory appeal challenging that decision; rather, "the availability of dismissal after final judgment will adequately protect and secure for the defendant

24

the benefit of his bargain under the nonprosecution agreement if he is entitled to it." Bailey, 34 F.3d at 691; see Bird, 709 F.2d at 392 (same).

Here, Stolt-Nielsen and Wingfield may interpose the Agreement (as a defense to conviction) in a pre-trial motion. See, e.g., Meyer, 157 F.3d at 1077 ("In accordance with due process, [the defendant] was entitled to a judicial determination that he had breached the agreement before being subjected to the risk of conviction. The district court's pretrial [but post-indictment] evidentiary hearing satisfied this requirement.").[6]

_____

[6] In our view, the pre-trial determination approved by the Seventh Circuit in Meyer does not conflict with the observations of the Fifth and Eighth Circuits that non-prosecution agreements of the sort involved in this case protect against the risk of conviction and punishment, not trial. See Bailey, 34 F.3d at 691; Bird, 709 F.2d at 392. For one thing, Bailey and Bird concerned attempted interlocutory appeals from district court denials of post-indictment claims that immunity agreements barred conviction, and as such were not concerned with the timing of the claims in the district court. In any event, it is not in the interest of defendants or the Government, once an indictment has been issued, to proceed with a trial before determining whether an immunity agreement bars conviction. We therefore agree with the Seventh Circuit that a pre-trial hearing is appropriate in these circumstances. We note, however, that this timing is not essential, and a defendant may raise an immunity agreement as a defense during the trial.

25

But their contention that the immunity they purportedly received under the Agreement precludes an indictment in the first place is belied by precedent, and we see no compelling reason to reach a different result in this case.

*　　*　　*　　*　　*

"[A] suit in equity does not lie where there is a plain, adequate and complete remedy at law . . . [that is] as complete, practical and efficient as that which equity could afford." Terrace v. Thompson, 263 U.S. 197, 214 (1923). Here, Stolt-Nielsen and Wingfield have a practical and efficient — and indeed complete — legal remedy available to them, i.e., access to a federal forum post-indictment in which they may assert the Agreement as a defense. Separation-of-power concerns thus counsel against using the extraordinary remedy of enjoining the Government from filing the indictments. Although courts have carved out a narrow exception to this rule in those cases in which the very act of filing an indictment may chill First Amendment rights, this case does not implicate that concern. Instead, we are guided by other cases in which the Supreme Court and Courts of Appeals have held that non-prosecution agreements may not form the basis for enjoining indictments before they issue.

In this context, we conclude that the District Court lacked authority to employ the extraordinary remedy of enjoining the Government's indictments of Stolt-Nielsen and Wingfield. The

26

judgment is therefore reversed and the case remanded with the instruction that the District Court dismiss their complaints with prejudice.[7]

---

[7] Because we conclude that the District Court lacked the power to enjoin the filing of indictments in this case, we need not consider, at this stage, the Government's alternative argument that the District Court inappropriately concluded that Stolt-Nielsen's and Wingfield's actions between March and November 2002 did not violate the terms of the Agreement. As stated, the District Court's lack of authority compels us to reverse the judgment and remand to that Court so that it may dismiss the complaints. Because the judgment is reversed, it lacks preclusive effect. See, e.g., Joseph A. ex rel. Wolfe v. Ingram, 275 F.3d 1253, 1266 (10th Cir. 2002) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel." (internal quotation marks omitted)). Therefore, if the appellees assert the Agreement as a defense after they are indicted, the District Court must consider the Agreement anew and determine the date on which Stolt-Nielsen discovered its anticompetitive conduct, the Company's and Wingfield's subsequent actions, and whether, in light of those actions, Stolt-Nielsen complied with its obligation under the Agreement to take "prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity."